Isamu Carlos SHIBAYAMA, Kenichi Javier Shibayama, Takeshi Jorge Shibayama, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 00–4C.

United States Court of Federal Claims.

Dec. 19, 2002.

Karen Parker, San Francisco, California, attorney for the plaintiffs.

Rachel J. Hines, Federal Programs Branch, with Vincent M. Garvey, Deputy Branch Director, Civil Division, United States Department of Justice, Washington D.C., attorneys for the defendant.

## OPINION

HORN, Judge.

### BACKGROUND

On February 19, 1942, President Franklin D. Roosevelt issued Executive Order No. 9066 which, in pertinent part, authorized "the Secretary of War, and the Military Commanders whom he may from time to time designate ... to prescribe military areas ... from which any or all persons may be excluded ...." Exec. Order No. 9066, 7 Fed.Reg. 1407 (Feb. 19, 1942). On July 31, 1980, the United States Congress enacted the Commission on Wartime Relocation and Internment of Civilians Act to study the impact of Executive Order No. 9066 on the approximately 120,000 civilians who were relocated and detained in internment camps. *See* Pub.L. No. 96–317, § 2, 94 Stat. 964 (1980). In the Act, a Commission on Wartime Relocation and Internment of Civilians (the Commission) was established to conduct a "review of the facts and circumstances surrounding Executive Order Numbered 9066, issued February 19, 1942, and the impact of such Executive Order on American citizens and permanent resident aliens." *See id.* The Commission issued its report in 1982, entitled *Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians* (1982), and its formal recommendations in 1983, entitled *Personal Justice Denied: Part 2: Recommendations: Report of the Commission on Wartime Relocation and Internment of Civilians* (1983).

In response to the Commission's findings, Congress adopted the Civil Liberties Act of 1988 (CLA) which attempted to:

(1) acknowledge the fundamental injustice of the evacuation, relocation, and internment of United States citizens and permanent resident aliens of Japanese ancestry during World War II; (2) apologize on behalf of the people of the United States for the evacuation, relocation, and internment of such citizens and permanent resident aliens; (3) provide for a public education fund to finance efforts to inform the

public about the internment of such individuals so as to prevent the recurrence of any similar event; [and] (4) make restitution to those individuals of Japanese ancestry who were interned . . . .

50 U.S.C. app. § 1989 (1994). In addition, the CLA stated the following:

> The Congress recognizes that, as described by the Commission on Wartime Relocation and Internment of Civilians, a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry by the evacuation, relocation, and internment of civilians during World War II. As the Commission documents, these actions were carried out without adequate security reasons and without any acts of espionage or sabotage documented by the Commission, and were motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership. The excluded individuals of Japanese ancestry suffered enormous damages, both material and intangible, and there were incalculable losses in education and job training, all of which resulted in significant human suffering for which appropriate compensation has not been made. For these fundamental violations of the basic civil liberties and constitutional rights of these individuals of Japanese ancestry, the Congress apologizes on behalf of the Nation.

*Id.* at § 1989a(a).

The CLA created a trust fund, 50 U.S.C. app. § 1989b–3(e), and directed the Attorney General to payout to each "eligible individual" the sum of $20,000.00. *See id.* at § 1989b–4 (a)(1). In relevant part, the CLA defined an "eligible individual" as follows:

> (2) the term "eligible individual" means any individual of Japanese ancestry . . . who is living on the date of the enactment of this Act [Aug. 10, 1988] and who, during the evacuation, relocation, and internment period—
> (A) was a United States citizen or a permanent resident alien; and
> (B)(i) was confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of—
> (I) Executive Order Numbered 9066, dated February 19, 1942 . . . .

*Id.* at § 1989b–7(2). The Act placed an eligibility time limitation on the period of "evacuation, relocation, and internment period," beginning on December 7, 1941, and ending on June 30, 1946. *Id.* at § 1989b–7(1). Congress defined "permanent resident alien" as "an alien lawfully admitted into the United States for permanent residence." *Id.* at § 1989b–7(3). In addition, Congress included in the CLA a presumption regarding the weight of the evidence presented by a claimant seeking compensation:

> When, after consideration of all evidence and relevant material for determining whether an individual is an eligible individual, there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of eligibility, the benefit of the doubt in resolving each such issue shall be given to such individual.

*Id.* at § 1989b–4(a)(3); *see Kaneko v. United States,* 122 F.3d 1048, 1051 (Fed.Cir.1997) (noting that the " 'benefit of the doubt' standard must be applied in appropriate cases, . . . ."); *Motoyoshi v. United States,* 33 Fed. Cl. 45, 53 (1995).

Under the CLA, Congress assigned the responsibility of locating and paying eligible individuals to the Attorney General at the United States Department of Justice (DOJ). *See* 50 U.S.C. app. § 1989b–4(a). "The Attorney General delegated the responsibilities and duties assigned him by the Act to the Assistant Attorney General for Civil Rights, who, in turn, established the Office of Redress Administration [ORA] in the Civil Rights Division to carry out the execution of the responsibilities and duties under the Act." 54 Fed.Reg. 34,157 (Aug. 18, 1989) (to be codified at 28 C.F.R. pt. 74). If an individual claimant was denied eligibility by the ORA, the claimant was permitted to appeal the decision to the Assistant Attorney General for Civil Rights or his or her delegee. *See id.* at 34,161. The decision of the Assistant Attorney General for Civil Rights on appeal constituted final action by the DOJ on the claim. *See id.* The CLA also provided that claimants denied redress could appeal the denial to this court. *See* 50 U.S.C. app.

§ 1989b–4(h)(1) (Supp. V 1993). The CLA originally terminated the trust fund on the sunset date, "10 years after the date of the enactment of this Act," August 10, 1998. *Id.* at § 1989 b–3 (d) (1988).

On August 18, 1989, DOJ adopted regulations for the enforcement of the CLA. *See* 54 Fed.Reg. at 34,157 (to be codified at 28 C.F.R. pt. 74). In response to comments received on the rules, the DOJ stated:

> The last major eligibility issue pertains to persons of Japanese ancestry who were sent to the United States from other American countries for restraint and repatriation pursuant to international commitments of the United States Government for the security of the United States and its associated powers.... Although these individuals were evacuated, relocated or interned similarly to those of Japanese ancestry evacuated from the West Coast, the statutes's threshold requirement that an eligible person must be a citizen of the United States or a permanent resident alien excludes most of these persons from redress payment. Records indicate that the people who entered the United States under these international agreements were determined by the Department of Justice to be illegal aliens. As such, they were not lawfully admitted to the United States for permanent residence. Consequently, the restrictive language of the Act pertaining to citizenship status renders such persons ineligible. On the other hand, after World War II some of the Latin American Japanese who were brought to the United States from other American republics for internment were permitted, under applicable statutes, to apply to the Attorney General of the United States for an adjustment of their immigration status; these individuals obtained the status of permanent resident alien extending retroactively to the internment period. Such persons would meet the threshold statutory requirement under the regulations of being permanent resident aliens during the evacuation, relocation and internment period and, as such, be eligible for compensation.

*Id.* at 34,160.

In 1999, after the original sunset date of August 10, 1998, Congress passed section 3021 of the Emergency Supplemental Appropriations Act of 1999, which gave the Attorney General discretion to allocate up to $4.3 million for the purpose of providing further compensation for eligible individuals identified under the CLA. *See* Emergency Supplemental Appropriations Act of 1999, Pub.L. No. 106–31, § 3021, 113 Stat. 57 (1999).

## FINDINGS OF FACT

The plaintiffs, Isamu Shibayama, Kenichi Shibayama, and Takeshi Shibayama, are three brothers of Japanese ancestry who were born in Peru and whose native language is Spanish. Mr. Isamu Shibayama was born on June 6, 1930. Mr. Kenichi Shibayama was born on January 5, 1937. Mr. Takeshi Shibayama was born on July 18, 1938. According to the plaintiffs, their grandfather was a Peruvian citizen and their grandmother and parents were permanent residents of Peru.

The plaintiffs allege that on March 1, 1944, plaintiffs, their three sisters, and their parents were abducted in Peru by the United States armed forces and their Peruvian immigration documents were seized and never returned. Plaintiffs state that their family was then placed on the U.S.S. Cuba under armed guard and transported to New Orleans, Louisiana on March 21, 1944. The Shibayama family was taken to the Crystal City Internment Camp, Crystal City, Texas and appear on a custody log at the Crystal City Internment Camp, dated December 31, 1944.

On March 30, 1946, the United States served arrest warrants on the plaintiffs and other members of their family, charging them with not possessing passports or immigration visas. The plaintiffs state that on September 9, 1946, the Shibayama family was released from the Crystal City Internment Camp and subsequently relocated to Seabrook Farms, New Jersey. From the time of their arrival at Seabrook Farms until March 1949, plaintiffs' father, Mr. Yuzo Shibayama, sought to have his family returned to Peru, but was denied because the family members did not possess Peruvian immigration documents. In March 1949, plaintiffs'

father obtained a sponsor and moved the family to Chicago, Illinois.

From April 30, 1952 until April 7, 1954, Mr. Isamu Shibayama served in the United States Armed Forces. He was honorably separated on April 7, 1954, but remained in a Reserve unit for the next six years until he was honorably discharged on May 27, 1960.

Sometime prior to December 4, 1953, while serving in the U.S. Armed Forces, Mr. Isamu Shibayama sought to be naturalized under the provisions of Pub.L. No. 86.[1] On November 18, 1953, Lt. Colonel Flatter recommended the approval of an application to file a petition for Mr. Isamu Shibayama's naturalization. In a December 17, 1953 letter, however, an Assistant Commissioner of the Inspections and Examinations Division of the Immigration and Naturalization Service (INS) informed Mr. Isamu Shibayama that he would be ineligible for naturalization under Pub.L. No. 86 because he did not have "a lawful admission for permanent residence or a lawful admission for other than permanent residence and one year's continuous residence in the United States prior to induction into the armed forces of the United States."

The plaintiffs have proffered a transcript from an INS reopened deportation hearing, held on August 10, 1954, in Chicago, Illinois, concerning the plaintiffs and the March 30, 1946 arrest warrants. The plaintiffs' ORA Administrative Record contains only a portion of the transcript. The August 10, 1954 hearing conducted under oath by INS Special Inquiry Officer Thomas W. Gleason, states that the March 30, 1946 arrest warrants were issued by the Acting District Director of the INS in San Antonio, Texas and further:

[I]t is charged that the aliens [including plaintiffs], . . . who entered this country at New Orleans, Louisiana on March 21, 1944, have been found in the United States in violation of the immigration laws thereof and are subject to be taken into custody and deported pursuant to the following provisions of law and for the following reasons, to wit: The Immigration Act of May 26, 1924, in that, at the time of entry, they were immigrants not in possession of a valid immigration visa and not exempted from the presentation thereof by said Act or regulations made thereunder; the Passport Act approved May 22, 1918, as amended, and the Act of February 5, 1917, in that, at the time of entry, they did not present an unexpired passport or official document in the nature a passport issued by the government of the country to which they owe allegiance or other travel document showing their origin and identity, as required by Executive Order in effect at time of entry.

At the August 10, 1954 hearing, the INS Special Inquiry Officer stated that he possessed an order of the Board of Immigration Appeals of the DOJ, dated September 2, 1949, which conveyed that the outstanding orders and warrants of deportation were withdrawn and the plaintiffs' cases for deportation would be held in abeyance pending final action on the plaintiffs' parents' application for suspension of deportation. The INS Special Inquiry Officer proceeded to question the plaintiffs regarding their employment, residence, and other background information. The INS Special Inquiry Officer concluded the August 10, 1954 hearing, stating that:

As soon as practical after the conclusion of this hearing, I will prepare a written decision, signed by me, setting forth a summary of the evidence regarding your deportability and a discussion as to whether

---

1. Pub.L. No. 86, which provided for the "naturalization of persons serving in the Armed Forces of the United States after June 24, 1950," stated,

Notwithstanding the provisions of section 310(d) and 318 of the Immigration and Nationality Act, any person, not a citizen, who, after June 24, 1950, and not later than July 1, 1955, has actively served or actively serves, honorably, in the Armed Forces of the United States for a period or periods totaling not less than ninety days and who (1) having been lawfully admitted to the United States for permanent residence, or (2) having been lawfully admitted to the United States, and having been physically present within the United States for a single period of at least one year at the time of entering the Armed Forces, may be naturalized on petition filed not later than December 31, 1955, upon compliance with all the requirements of the Immigration and Nationality Act . . . .

Act of June 30, 1953, ch. 162, Pub.L. No. 86, 67 Stat. 108–09.

or not you should be granted the privilege of suspension of deportation. In addition, if you are not granted the privilege of suspension of deportation, it will also include findings of fact and conclusions of law as to your deportability. It will be concluded with the order entered in your case. A signed copy of it will be served upon your counsel, together with a notice advising him as to his right to appeal from this decision to the Board of Immigration Appeals at Washington, D.C. There will be no fee for any such appeal.

The plaintiffs' Administrative Record does not contain a record of the written decision by INS Special Inquiry Officer Thomas W. Gleason subsequent to the August 10, 1954 hearing. The plaintiffs' Administrative Record does contain a November 23, 1955 decision issued by INS Special Inquiry Officer E.A. Berman. The November 23, 1955 decision states that on January 26, 1955, plaintiffs filed an application for suspension of deportation under section 244 of the Immigration and Nationality Act. The November 23, 1955 decision also stated that on October 19, 1955, a reopened hearing was held and the plaintiffs applied, in the alternative, for the privilege of voluntary departure and preexamination.[2] The November 23, 1955 decision stated that:

> On the evidence in this case it is concluded that all of the respondents have established statutory eligibility for the privilege of voluntary departure and have met the requirements for preexamination. As they can adjust their immigration status through voluntary departure and preexamination, it is believed that that is the maximum relief that should be authorized.

The parties have stipulated that sometime in 1956, plaintiffs exited the United States, entered Canada, applied for an immigrant visa, and then reentered the United States. Included in Mr. Isamu Shibayama's Administrative Record is an INS preexamination form, signed by Mr. Isamu Shibayama on November 10, 1955. The INS preexamination form indicates that Mr. Isamu Shibayama intended to leave the United States at the port of Windsor, Canada, apply for an immigration visa at the United States Consulate, and reenter the United States at the port of Detroit, Michigan. The parties stipulate that upon their arrival in the United States, Mr. Isamu Shibayama and Mr. Kenichi Shibayama were granted permanent resident alien status on June 22, 1956, and Mr. Takeshi Shibayama was granted permanent resident alien status sometime in 1956. Mr. Takeshi Shibayama became a United States naturalized citizen on January 28, 1964. Mr. Isamu Shibayama became a United States naturalized citizen on September 8, 1970.

On January 2, 1989, Mr. Kenichi Shibayama completed an ORA Voluntary Information Form providing current and historical information on his potential eligibility for redress under the CLA. Mr. Takeshi Shibayama provided similar information to the ORA on February 26, 1989. Mr. Isamu Shibayama also provided current and historical information regarding his potential eligibility for CLA compensation through an undated letter included in his Administrative Record. In addition, on May 31, 1992, Mr. Isamu Shibayama provided further information regarding his eligibility for compensation through a declaration of his alien status as a person of Japanese ancestry.

By letter dated November 10, 1992, the ORA notified Mr. Kenichi Shibayama that subsequent to a thorough investigation, ORA determined that he was not a permanent resident alien during the internment period and was ineligible for redress payment under the CLA. The November 10, 1992 correspondence stated that the ORA found that Mr. Kenichi Shibayama did not obtain permanent resident alien status extending retroactively to the internment period. The November 10, 1992 letter informed Mr. Kenichi Shibayama that he could appeal the decision of the ORA to the Assistant Attorney General of the Civil Rights Division of DOJ within sixty days of receipt of the decision and the Assistant Attorney General of the Civil Rights Division's

---

2. The process of voluntary departure and preexamination required plaintiffs to exit and then lawfully re-enter the United States. Upon lawful re-entry, plaintiffs would then be given visas, which could be used to obtain permanent resident alien or citizenship status. Immigration and Nationality Act, Pub.L. No. 82–414, ch. 5, § 244, 66 Stat. 214, 215–217 (1952).

decision to affirm the finding of ineligibility would constitute "the final action of the Department [of Justice] on your redress appeal."

On April 22, 1993, Mr. Takeshi Shibayama, and on June 28, 1993, Mr. Isamu Shibayama, received letters from ORA similar to the one received by their brother Kenichi. The April 22, 1993 and June 28, 1993 letters informed Mr. Takeshi Shibayama and Mr. Isamu Shibayama that after a thorough investigation, the ORA determined that they also were ineligible for compensation under the CLA. The ORA concluded that Mr. Takeshi Shibayama and Mr. Isamu Shibayama were not permanent resident aliens during the internment period and they did not later obtain that status extending retroactively. Mr. Takeshi Shibayama and Mr. Isamu Shibayama were informed of their right to appeal the decision to the Assistant Attorney General of the Civil Rights Division of DOJ, and the denial of the appeal would be the final action by DOJ.

On August 17, 1993, Mr. Isamu Shibayama, represented by Mr. Richard G. Konda of the Asian Law Alliance, filed an appeal of his denial for redress compensation under the CLA with the Assistant Attorney General of the Civil Rights Division, DOJ. The August 17, 1993 appeal stated that Mr. Isamu Shibayama should be found eligible for redress payments under the CLA pursuant to "the well established doctrine of PRUCOL, permanently residing under color of Law . . . ." The August 17, 1993 appeal also sought redress payment under the CLA because "the Justice Department should be estopped from now asserting that Mr. [Isamu] Shibayama was an illegal alien when he entered the U.S."

On September 24, 1993, the Appellate Section of the Civil Rights Division, DOJ acknowledged receipt of Mr. Isamu Shibayama's appeal of the denial of redress under the CLA. The Appellate Section of the Civil Rights Division, DOJ also informed Mr. Isamu Shibayama of his right to supplement the appeal with additional details within thirty days of receipt of the notice.

On October 26, 1994, the Office of the General Counsel for INS reviewed Mr. Keni-

chi Shibayama's and Mr. Takeshi Shibayama's permanent resident alien status. The Office of the General Counsel stated in its review that to obtain compensation under the CLA, a former internee must have been a citizen or permanent resident alien during the period of December 7, 1941, through June 30, 1946. The Office of the General Counsel's review determined that:

On June 22, 1956, he [Mr. Kenichi Shibayama] obtained an immigrant visa at the United States Consulate in Windsor, Ontario. He entered the United States the same day through the port of entry in Detroit. The Service [INS] admitted him as a permanent resident on that date.

Mr. Shibayama obtained permanent residence by entry into the United States with an immigrant visa rather than by suspension of deportation. His permanent resident status dated from his entry in 1955 rather than his entry in 1944. His acquisition of permanent residence does not date back to the period fixed by section 108(c) of the Civil Liberties Act.

Similarly, the Office of the General Counsel for INS found that:

[H]e [Mr. Takeshi Shibayama] obtained an immigrant visa at a United States Consulate abroad. He entered the United States. The Service [INS] admitted him as a permanent resident. Mr. Shibayama's file does not contain his immigrant visa. From papers that he filed in conjunction with his later naturalization, however, it appears that the date of his admission as a permanent resident is June 22, 1956, and that he entered the United States through the port of entry in Detroit . . . .

Mr. Shibayama obtained permanent residence by entry into the United States with an immigrant visa rather than by suspension of deportation. His permanent resident status dated from his entry in 1955 rather than his entry in 1944. His acquisition of permanent residence does not date back to the period fixed by section 108(c) of the Civil Liberties Act.

On May 4, 1995, the ORA responded by separate letter to inquiries by Mr. Kenichi

Shibayama and Mr. Takeshi Shibayama regarding the status of their redress claims under the CLA. The May 4, 1995 letters informed Mr. Kenichi Shibayama and Mr. Takeshi Shibayama that the INS had completed a review of their cases and determined that their permanent residence status was not misclassified during World War II and their status would not be awarded retroactively to the internment period. Based on INS's confirmation of Mr. Kenichi Shibayama's and Mr. Takeshi Shibayama's permanent residence status, the May 4, 1995 letters informed them that "ORA's letter of ineligibility dated November 10, 1992 [and April 22, 1993], remains in effect."

The Office of the General Counsel for INS also conducted a review of Mr. Isamu Shibayama's resident alien status on May 11, 1995. The Office of the General Counsel for INS determined that he also had obtained an immigrant visa at the United States Consulate in Windsor, Ontario on June 22, 1956. According to the Office of the General Counsel of INS, Mr. Isamu Shibayama obtained permanent resident alien status by entry into the United States through the port of entry in Detroit, Michigan. The Office of the General Counsel for INS determined that:

> Mr. [Isamu] Shibayama obtained permanent residence by entry into the United States with an immigrant visa rather than by suspension of deportation. His permanent resident status dated from his entry in 1956 rather than his entry in 1944. His acquisition of permanent residence does not date back to the period fixed by section 108(c) of the Civil Liberties Act.

On February 13, 1996, David K. Flynn, Chief of the Appellate Section of the Civil Rights Division, DOJ, issued a decision on Mr. Isamu Shibayama's August 17, 1993 appeal of the ORA's denial of redress compensation under the CLA. Mr. Flynn stated that after a careful review of Mr. Isamu Shibayama's record, he could find no basis for reversing the ORA's determination of ineligibility. After considering Mr. Isamu Shibayama's grounds for appeal, Mr. Flynn found that the terms of the CLA only provided compensation for individuals who were United States citizens, permanent resident aliens

during the internment period or had acquired retroactive permanent resident alien status after the war, and because Mr. Isamu Shibayama could not satisfy these requirements, his appeal was denied.

It appears from their Administrative Records that neither Mr. Kenichi Shibayama nor Mr. Takeshi Shibayama appealed the denial of their respective applications to the Assistant Attorney General of the Civil Rights Division.

On June 11, 1998, then-Chief Judge Smith issued an "Order Granting Preliminary Approval of Settlement Agreement" in *Mochizuki v. United States*, 41 Fed.Cl. 54 (1998). The order stated that the court was preliminarily certifying a class, pursuant to Rule 23 of the Rules of the United States Court of Federal Claims, of:

> [P]ersons who have not previously received payments under the Civil Liberties Act of 1988 from the Office of Redress Administration, United States Department of Justice, and who are (a) persons of Japanese ancestry who were living in Latin America before World War II and who were interned in the United States at any time during the period from December 7, 1941, to June 30, 1946; OR (b) persons who are spouses, children or parents of persons who died after August 10, 1988, and who met the qualifications of (a) above.

*Id.* at 55. The order also stated that class members identified above would have the opportunity to opt-out of the class after receiving the notice of the preliminary class certification. *Id.* On January 25, 1999, then-Chief Judge Smith issued an opinion and order in *Mochizuki v. United States*, 43 Fed. Cl. 97 (1999). The *Mochizuki v. United States* opinion certified the class identified above and approved the settlement reached by the class of plaintiffs and the government. *Id.* The plaintiffs in this case received notice of the class action lawsuit in *Mochizuki v. United States*, and chose to opt-out of the class and subsequently filed complaints in the United States District Court for the Northern District of California on February 18, 1999.

The plaintiffs' complaint named Janet Reno, individually and in her official capacity

as Attorney General of the United States, Dede Green, individually and in her official capacity as Director of the Office of Redress Administration, John Does 1–10, and the United States, as defendants. The plaintiffs sought declaratory and injunctive relief for breach of fiduciary duty and violation of federal civil rights and humanitarian law. On July 30, 1999, the defendants filed a motion to dismiss, or in the alternative, a transfer of plaintiffs' claims to the United States Court of Federal Claims. On October 12, 1999, Judge Charles A. Legge of the United States District Court for the Northern District of California issued an order of transfer. The order of transfer found that the United States Court of Federal Claims had exclusive jurisdiction of the plaintiffs' claims against the United States, and, therefore, transferred the plaintiffs' claims against the United States to this court. The order of transfer also ordered the following: "IT IS FURTHER ORDERED that defendants' motion to dismiss the claims against the individual defendants is granted, for the reasons that those defendants have not been served in their individual capacities; and if they were served in the future, the claims against them would be barred by qualified immunity."

## DISCUSSION

The plaintiffs' complaint seeks injunctive and declaratory relief against the United States. The plaintiffs' complaint requests this court to review ORA's denial of eligibility for restitution under the CLA, declaratory and injunctive relief to order the expunge-

ment from plaintiffs' records that they were ever "illegal aliens," an apology and disbursement of funds from the United States for public education concerning the alleged unlawful abduction and detention of Latin Americans of Japanese ancestry by the United States, restitution for excessive income taxes assessed based on the alleged characterization of the plaintiffs as "illegal aliens" by the United States, and restitution for actions by the United States that allegedly violated humanitarian law having the status of *jus cogens*.[3]

Defendant has filed a motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC), a motion to dismiss for failure to state a claim under RCFC 12(b)(6),[4] and a motion for summary judgment on the administrative record, pursuant to RCFC 56.1. The defendant's motions first address the plaintiffs' claims that they were improperly denied compensation under the CLA and then proceed to request the court to either dismiss or grant summary judgment on the administrative record on the plaintiffs' remaining claims that challenge the denial of CLA compensation on the basis of the Administrative Procedure Act (APA), 5 U.S.C. § 702 et seq., 42 U.S.C. § 1981, the Fifth Amendment to the Constitution of the United States, and international humanitarian law.

## I. MONEY–MANDATING STATUTE

The defendant has initially claimed that the court lacks subject matter jurisdiction

---

**3.** *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C.Cir.1994), defined *jus cogens* as:

[A] principle of international law that is "accepted by the international community of States as a whole as a norm from which no derogation is permitted...." *Committee of U.S. Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C.Cir.1988), quoting Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, U.N.Doc. A/ Conf. 39/27, 8 I.L.M. 679. Such peremptory norms are "nonderogable and enjoy the highest status within international law," *Committee of U.S. Citizens in Nicaragua*, 859 F.2d at 940; they "prevail over and invalidate international agreements and other rules of international law in conflict with them," and they are "subject to modification only by a subsequent norm of international law having the same character." Restatement

[(Third) of the Foreign Relations Law of the United States] § 102 comment k.
*Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1173 (C.A.D.C.1994).

**4.** The United States Court of Federal Claims issued revised Rules on May 1, 2002. Under the former Rules, a motion to dismiss for failure to state a claim could be brought pursuant to RCFC 12(b)(4). Under the revised Rules, a motion to dismiss for failure to state a claim may be brought under RCFC 12(b)(6). The revision did not otherwise change the requirements or the substance for a motion to dismiss for the failure to state a claim. The defendant originally brought a motion to dismiss under RCFC 12(b)(4) of the old Rules. The court will consider the defendant's motion to dismiss under the new RCFC 12(b)(6).

"because the CLA is no longer a money-mandating statute and no longer has available funds from which a judgment can be paid to Plaintiffs." The defendant also claims that the court lacks subject matter jurisdiction over claims for payment under the CLA pursuant to the 1999 Emergency Supplemental Appropriations Act, Pub.L. No. 106–31, § 3021, 113 Stat. 57. In addition, the defendant claims that the plaintiffs' claims for restitution under the CLA should be dismissed because the relevant appropriations have expired and therefore, their claims are moot. Finally, in a related argument, the defendant alleges that "because there are no funds from which a judgment could be awarded, Plaintiffs' claims are not redressable and should be dismissed for lack of standing."

Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, even on appeal. *Fanning, Phillips, Molnar v. West,* 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States,* 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of jurisdiction), *aff'd,* 292 F.3d 1383 (Fed.Cir. 2002); *Schweiger Constr. Co. v. United States,* 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *Martinez v. United States,* 48 Fed.Cl. 851, 857 (2001), *aff'd in part,* 281 F.3d 1376 (Fed.Cir.), *reh'g denied* (2002); *Bowen v. United States,* 49 Fed.Cl. at 675; *Vanalco, Inc. v. United States,* 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir. 1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir.) (*reh'g and reh'g en banc denied* 2002); *Conti v. United States,* 291 F.3d 1334, 1338 (Fed. Cir.) (*reh'g en banc denied* 2002); *Consolidated Edison Co. v. O'Leary,* 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir. 1989); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir. 1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.'"); *RCS Enters., Inc. v. United States,* 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the Rules of the Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)).

"[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.) *(reh'g and reh'g en banc denied* 2002); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir.2002); *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir. 1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir. 2002); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir.

1993) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *Vanalco v. United States,* 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute.").

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994). The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995), *aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001);

*United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Saraco v. United States*, 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied*, 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan*, 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001), *cert. granted*, 535 U.S. 1016, 122 S.Ct. 1604, 152 L.Ed.2d 619 (2002); *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000); *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States*, 118 F.3d 1553, 1555–56 (Fed.Cir. 1997), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell*, 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.' " *White*

*Mountain Apache Tribe v. United States*, 249 F.3d at 1372 (quoting *United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948; *Tippett v. United States*, 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera*, 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States*, 100 F.3d 1576, 1579 (Fed.Cir. 1996), *reh'g denied, en banc suggestion declined* (1997); *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. at 607, 372 F.2d at 1009.

■ With the enactment of the CLA in 1988, Congress authorized the appropriation of $1.25 billion to finance the Fund from which payments would be made to eligible individuals. 50 U.S.C. app. §§ 1989b–3(e), 1989b–4(a)(1) (1988). The CLA conditioned the payment of restitution to eligible individuals on the availability of funds appropriated to the Fund. *Id.* at § 1989b–4(a)(1). The CLA provided a "sunset provision" that terminated the Fund when the money appropriated had been expended to satisfy the claims under the Act, or ten years after the date of the enactment of the CLA, whichever occurred first, i.e., no later than August 10, 1998. *Id.* § 1989b–3(d). The appropriations for the Fund was increased to $1.65 billion in 1992. 50 U.S.C. app. § 1989b–3(e) (Supp. V 1993).[5] As originally enacted, the duties of the Attorney General were to cease when the Fund terminated under § 1989b–4(e). In 1992, however, Congress amended the CLA to extend the Attorney General's duties until

---

5. The United States Court of Federal Claims in *Murakami v. United States*, 46 Fed.Cl. 653 (2000), provided an explanation regarding the final distribution of the $1.65 billion appropriated in 1992 by the DOJ as follows:

> Following this afformation [March 25, 1998], but prior to the sunset of the Act, On August 7, 1998, Milton McConkey, the budget officer for the ORA, obligated all of the funds remaining in the Fund ($8,941,018.00) to avoid having those dollars revert to the miscellaneous receipts account in the Treasury. This action

was taken in reliance upon 31 U.S.C. § 1502(b), which, in appropriate circumstances, allows agencies to retain funds that would otherwise revert to the Treasury in anticipation of the payment of judgments and settlements in litigation. As a result of the action taken by Mr. McConkey, on August 10, 1998, all the monies in the Fund remained with the ORA and none reverted to the Treasury.

*Murakami v. United States*, 46 Fed.Cl. at 655.

180 days after the Fund terminated. 50 U.S.C. § 1989b–4(e) (Supp. V 1993).

The defendant asserts that this court does not have jurisdiction over the plaintiffs' claims because, although the CLA was once a money-mandating statute, "Congress clearly intended that Act [CLA] to expire ten years from the date of passage.... Thus, the CLA was no longer a money-mandating statute when Plaintiffs filed their federal court complaint on February 18, 1999."

The United States Court of Federal Claims addressed a similar claim in *Murakami v. United States,* and stated:

> The language of section 1989b–3(d) is seemingly unambiguous in requiring the Fund to terminate no later than August 10, 1998. Section 1989b–4(g)(1) further provides that "[a]n eligible individual may be paid under this section only from amounts in the Fund." *See also* 50 U.S.C.App. § 1989b–4(g)(2) ("Nothing in this title ... shall authorize the payment to an eligible individual by the United States Government of any amount authorized by this section from any source other than the Fund").

> \*     \*     \*     \*     \*     \*

> This court, however, will refrain from resolving this issue because it believes that section 3021 of the Appropriations Act, in combination with the Act, provides a more certain basis for the payment of any judgment rendered herein ....

*Murakami v. United States,* 46 Fed.Cl. at 657–58; *see also Odow v. United States,* 51 Fed.Cl. 425, 430–31 (2001).

Subsequent to the Fund termination date of August 10, 1998, Congress passed the 1999 Supplemental Appropriations Act (Appropriations Act), Pub.L. 106–31, 113 Stat. 57. Section 3021 of the Appropriations Act provides, in relevant part:

> Notwithstanding 50 U.S.C.App.1989b et seq. and in addition to any funds previously appropriated for this purpose, the Attorney General *may* make available from any funds available to the Department of Justice not more than $4,300,000 for the purpose of paying restitution to individuals: (1) who are eligible for restitution under

the Civil Liberties Act of 1988 (50 U.S.C.App.1989b et seq.) and who have filed timely claims for restitution .... .

Pub.L. No. 106–31, § 3021, 113 Stat. 57. (emphasis added).

Focusing on the word "may," defendant asserts that, " '[w]hen the plain language of a statute is discretionary, courts have held that the statute is not money-mandating.' (quoting *Hoch v. United States,* 33 Fed.Cl. 39, 42 (1995))." Defendant points to the word "may" in § 3021 as proof that:

> Congress made any action on the part of the Attorney General discretionary.... Because Congress permitted-but did not require-the Attorney General to reprogram funds from other Department of Justice accounts to pay timely and eligible claims, section 3021 is not a money-mandating statute sufficient to invoke the jurisdiction of this Court.

The *Murakami* court also addressed a claim similar to the one offered by the defendant in this case, and stated:

> As previously noted, this appropriations provision indicated that "notwithstanding 50 U.S.C.App.1989b et seq.," the Attorney General "may" make available from any funds available to the Department of Justice not more that $4,300,000 for the purpose of paying restitution to individuals "who are eligible for restitution under the Civil Liberties Act of 1988 ... and who have filed timely claims for restitution." [Pub.L. No. 106–31, § 3021, 113 Stat. 57.] This provision thus allows for the payment of restitution "notwithstanding" the sunset provision of the original Act.... Seizing on the statute's use of the word "may," defendant argues that section 3021 does not authorize the payment of judgments because it gives the Attorney General discretion to reprogram funds, but does not require her to do so. *See, e.g., Collins v. United States,* 67 F.3d 284, 286 (Fed.Cir. 1995); *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007–09 (1967). While permissive language, such as the word "may," often signals that Congress does not intend to create a substantive right to compensation, the use of

such discretionary terminology is not necessarily determinative. *See Confidential Informant v. United States,* 46 Fed.Cl. 1, 5 (2000). Indeed, in the related context of determining whether a statute is "money-mandating" for purposes of Tucker Act jurisdiction, this court has identified two characteristics that indicate that a statute containing discretionary language requires payment. First, the statute must "enumerate specific requirements that must be fulfilled before [a claimant] acquires an absolute right to compensation." *Hoch v. United States,* 33 Fed.Cl. 39, 42 (1995). *See also Tyson v. United States,* 91 Ct.Cl. 139, 32 F.Supp. 135, 136 (1940). Second, the statute must state a sum certain. *See id.* at 44; *Confidential Informant,* 46 Fed. Cl. at 5–6.

Critically, the discretionary language in Section 3021 relates only to the Attorney General's authority to reprogram funds— no discretion is afforded the Attorney General to decide who, among eligible individuals, should receive restitution. Rather, the statutory language requires the Attorney General to make such payments to all individuals eligible under the Act. Since the reprogramming authorized by section 3021 has already occurred, in this court's view, the condition for requiring the payment of restitution has been triggered. In these circumstances, the statute thus defines a specific set of requirements that must be fulfilled in order to obtain compensation, namely the eligibility standards in the original Act. By virtue of its reference to the Act, section 3021 also establishes a sum certain to be paid, namely, $20,000. Accordingly, based upon this language, the court finds that, triggered by the Attorney General's reprogramming of funds, section 3021 establishes a substantive right to compensation and thus constitutes a source of payment for a judgment rendered in this case. *See Selman v. United States,* 204 Ct.Cl. 675, 498 F.2d 1354, 1356 (1974); *Hirschmann v. United States,* 11 Cl.Ct. 338, 341 (1986) ("[w]here law or regulation requires that the government take action, jurisdiction will be found in this court"). *Id.* at 658; *see also Odow v. United States,* 51 Fed.Cl. at 431 ("[I]n so doing, § 3021

satisfies the same requirements as a money-mandating statute for the related purpose of Tucker Act jurisdiction: it sets forth a specific set of prerequisites for compensation [the CLA's eligibility standards] and establishes a sum certain to be paid ($20,000).") (citing *Hoch v. United States,* 33 Fed.Cl. 39, 42–43 (1995)).

The defendant's contention that § 3021 of the Appropriations Act is not money-mandating statute is rejected. First, the statutory text indicates that Congress intended to extend the sunset period of the CLA with the passage of § 3021. The use of the word "may" in § 3021 is not discretionary terminology because the statute incorporates specific requirements and a sum certain articulated in the CLA. The use of the word "may" in § 3021 "relates only to the Attorney General's authority to reprogram funds-no discretion is afforded the Attorney General to decide who, among eligible individuals, should receive restitution. Rather, the statutory language requires the Attorney General to make such payments to all individuals eligible under the Act." *Murakami v. United States,* 46 Fed.Cl. at 658. The language of § 3021, which provides, "[n]otwithstanding 50 U.S.C.App.1989b et seq. and in addition to any funds previously appropriated for this purpose," indicates that Congress intended § 3021 to continue to provide CLA relief despite the previously enacted sunset clause. Pub.L. No. 106–31, § 3021, 113 Stat. 57. Thus, § 3021 is a money-mandating statute that allows this court to exercise jurisdiction. Consequently, the defendant's claim that the plaintiffs' request for compensation under the CLA is moot and not redressable is not persuasive.

## II. FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Defendant asserts that Mr. Kenichi Shibayama and Mr. Takeshi Shibayama failed to exhaust their administrative remedies when they did not file a formal appeal with the Assistant Attorney General for the Civil Rights Division of DOJ, and that, therefore, this court lacks subject matter jurisdiction over their claims. The defendant alleges that the "CLA and its regulations indicate

that claimants must exhaust their claims by filing an original application with the ORA and a redress appeal prior to filing a federal court complaint."

The CLA was amended in 1992 to provide judicial review of the denial of compensation under the Act. *See* 50 U.S.C. app. § 1989b–4(h) (Supp.V.1993). Section 1989b–4(h) provides the following:

(1) Review by the Court of Federal Claims

A claimant may seek judicial review of a denial of compensation under this section solely in the United States Court of Federal Claims, which shall review the denial upon the administrative record and shall hold unlawful and set aside the denial if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

(2) Applicability

This subsection shall apply only to any claim filed in court on or after the date of the enactment of this subsection [Sept. 27, 1992].

50 U.S.C. app. § 1989b–4(h). The implementing regulations of the CLA issued by the Attorney General provide for an appeal procedure for the denial of compensation by the ORA. *See* 28 C.F.R. §§ 74.15, 74.16, 74.17 (1998). The regulations provide that individuals determined to be ineligible for compensation under the CLA will be notified in writing of "the right to petition for a reconsideration of the determination of ineligibility to the Assistant Attorney General for Civil Rights, and the right to submit any documentation in support of eligibility." 28 C.F.R. § 74.15. The regulations also provide the procedures for filing an appeal and how the Assistant Attorney General for the Civil Rights Division will process the appeal. *See* 28 C.F.R. §§ 74.16, 74.17. The regulations state that "[a] decision of affirmance shall constitute the final action of the Department on that redress appeal." 28 C.F.R. § 74.17. Neither the statute nor the regulations state

that judicial review in the Court of Federal Claims is precluded until an appeal has been made to the Assistant Attorney General for Civil Rights.

Since there is no statute mandating any administrative remedy for the plaintiffs' CLA claims, the question whether they must exhaust the DOJ appeal process is committed to the sound discretion of the court as governed by the principles set out by the Supreme Court in *McCarthy v. Madigan*, 503 U.S. 140, 144, 147–49, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).

"The doctrine of exhaustion of administrative remedies is one among related doctrines-including abstention, finality, and ripeness-that govern the timing of federal-court decision making." *McCarthy v. Madigan*, 503 U.S. at 144, 112 S.Ct. 1081. The doctrine is well established in the jurisprudence of administrative law, *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), and provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *accord Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed.Cir.1998); *Burlington N. R.R. Co. v. United States*, 752 F.2d 627, 629 (Fed.Cir.1985).

When deciding whether to require exhaustion of administrative remedies, the court first looks to congressional intent as expressed in the statute. *See McCarthy v. Madigan*, 503 U.S. at 144, 112 S.Ct. 1081; *see also Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 501–02, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). "Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs." *McCarthy v. Madigan*, 503 U.S. at 144, 112 S.Ct. 1081 (citations omitted); *accord Maggitt v. West*, 202 F.3d 1370, 1377 (Fed.Cir.2000).[6]

---

**6.** *Cf. Darby v. Cisneros*, 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) ("[W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an

agency rule requires appeal before review and the administrative action is made inoperative pending that review. Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action

The mandate that a plaintiff exhaust all administrative remedies prior to instituting a lawsuit in this court is intended to "serve[ ] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan,* 503 U.S. at 145, 112 S.Ct. 1081. In other words, the doctrine seeks to affirm the authority Congress has given administrative agencies to administer programs or interpret statutes. *McCarthy v. Madigan,* 503 U.S. at 145, 112 S.Ct. 1081. In addition, it promotes judicial efficiency by mooting judicial controversies that can be decided by the agency with special expertise, providing a useful record for controversies that cannot, and avoiding "piecemeal appeals." *McCarthy v. Madigan,* 503 U.S. at 145, 112 S.Ct. 1081; *see also Thomson Consumer Elecs., Inc. v. United States,* 247 F.3d 1210, 1214 (Fed.Cir.) (*reh'g and reh'g en banc denied* 2002).

However, " 'administrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.' " *McCarthy v. Madigan,* 503 U.S. at 146, 112 S.Ct. 1081 (quoting *West v. Bergland,* 611 F.2d 710, 715 (8th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980)). Individual litigant's interests weigh against exhaustion in three broad circumstances. First, requiring exhaustion of the administrative remedy may prejudice the plaintiff. *Maggitt v. West,* 202 F.3d at 1377 (citing *McCarthy v. Madigan,* 503 U.S. at 146–48, 112 S.Ct. 1081). "Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." *McCarthy v. Madigan,* 503 U.S. at 147, 112 S.Ct. 1081. In *Gibson v. Berryhill,* 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), although discussing state administrative remedies, the United States Supreme Court wrote: "State administrative remedies have been deemed inadequate by federal courts and hence not subject to the exhaustion requirement ... [m]ost often ... because of delay by the agency ...." Such delay is not characterized by any specific time limit in which to respond to claims. *See, e.g., Walker v. Southern Ry. Co.,* 385 U.S. 196, 198, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966), *reh'g denied,* 385 U.S. 1020, 87 S.Ct. 699, 17 L.Ed.2d 559 (1967) (holding that plaintiffs are not required to wait ten years or more on the administrative board to decide their claim); *Smith v. Illinois Bell Tel. Co.,* 270 U.S. 587, 591–92, 46 S.Ct. 408, 70 L.Ed. 747 (1926) (finding that an injured public service company "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court ....").

Second, the administrative remedy may be inadequate because, even if an agency can adjudicate the issue presented, it may not have authority to grant the type of relief requested. *McCarthy v. Madigan,* 503 U.S. at 147, 112 S.Ct. 1081 (citing *Gibson v. Berryhill,* 411 U.S. at 575 n. 14, 93 S.Ct. 1689); *see also McNeese v. Board of Ed. for Cmty. Unit Sch. Dist. 187,* 373 U.S. 668, 675, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) (finding that student plaintiffs did not have to exhaust administrative remedies when the school superintendent did not have authority to grant the requested relief).

Third, "an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *McCarthy v. Madigan,* 503 U.S. at 148, 112 S.Ct. 1081 (citing *Gibson v. Berryhill,* 411 U.S. at 575 n. 14, 93 S.Ct. 1689; *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968)). For example, the United States Supreme Court in *Houghton v. Shafer* held that it would be futile to require the petitioner to exhaust the administrative remedy of appeal to the Attorney General of Pennsylvania, or another officer, in light of the Attorney General's submission that the rules were "validly and correctly applied to petitioner" and "strictly enforced throughout the entire correctional system ...." *Houghton v. Shafer,* 392 U.S. at 640, 88 S.Ct. 2119.

has already become 'final' under 10(c) [of the APA]."). The court also wrote: "Of course, the exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA." *Id.* at 153–54, 113 S.Ct. 2539. The instant case is not governed by the APA.

Although the United States Court of Federal Claims is to "review the denial upon the administrative record," 50 U.S.C.App. § 1989(4)(h), the CLA does not mention a specific administrative prerequisite to filing a suit other than a "denial of compensation." *Id.* The Congress has not explicitly required exhaustion of administrative remedies through an appeal to the Assistant Attorney General for claims under the CLA. This court, therefore, has discretion to determine if exhaustion beyond a denial of compensation by the ORA should be required by evaluating whether the plaintiff's interests in having prompt access to a judicial forum outweigh the government's interest in favoring exhaustion. *See McCarthy v. Madigan,* 503 U.S. at 144, 146, 112 S.Ct. 1081.

The defendant has not offered any evidence that to allow the plaintiffs, Mr. Kenichi Shibayama and Mr. Takeshi Shibayama, access to this forum will cause " 'frequent and deliberate flouting of administrative processes' [which] could weaken [the] agency's effectiveness by encouraging disregard of its procedures." *Id.* at 145, 112 S.Ct. 1081 (quoting *McKart v. United States,* 395 U.S. [185, 195, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)]). In the present case, the Attorney General, through designated representatives, has exercised authority to review and determine the eligibility of Mr. Kenichi Shibayama and Mr. Takeshi Shibayama. The brothers have complied with the administrative processes established by the CLA. *See id.* at 147, 112 S.Ct. 1081. Mr. Kenichi Shibayama first submitted information to the ORA for redress compensation under the CLA on January 2, 1989. Mr. Takeshi Shibayama provided similar information to the ORA on February 26, 1989. Kenichi Shibayama did not receive a response from the ORA regarding his eligibility until he was notified that his claim was denied on November 10, 1992. Mr. Takeshi Shibayama did not receive a denial of eligibility for redress payments under the CLA until June 28, 1993. Mr. Kenichi Shibayama and Mr. Takeshi Shibayama waited over four years for administrative action on their request for compensation under the CLA.

The Attorney General and his designated officials also were afforded an opportunity to review Mr. Kenichi Shibayama's and Mr. Takeshi Shibayama's eligibility, this time with other DOJ officials in the INS, when, on October 26, 1994, the Office of the General Counsel for INS reviewed Mr. Kenichi Shibayama's and Mr. Takeshi Shibayama's permanent resident alien status. Moreover, the Attorney General, through the ORA, was afforded an opportunity to revisit the issues when the INS concurred with the ORA's determination that the brothers were ineligible for CLA compensation.

It appears from their Administrative Records that the Attorney General's various designated representatives have consistently determined the ineligibility of Mr. Kenichi Shibayama and Mr. Takeshi Shibayama for CLA compensation and requiring these plaintiffs to submit to the appeals process outlined at 28 C.F.R. § 74.15 et seq., "would be to demand a futile act." *Houghton v. Shafer,* 392 U.S. 639, 640, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968) (*cited with approval in McCarthy v. Madigan,* 503 U.S. at 148, 112 S.Ct. 1081). For example, on May 4, 1995, the ORA responded by separate letter to inquiries by Mr. Kenichi Shibayama and Mr. Takeshi Shibayama regarding the status of their redress claims under the CLA. The May 4, 1995 letters informed them that "ORA's letter of ineligibility dated November 10, 1992 [and April 22, 1993], remains in effect." In addition, although it appears from their Administrative Records that neither Mr. Kenichi Shibayama nor Mr. Takeshi Shibayama appealed the denial of their respective CLA redress applications to the Assistant Attorney General of the Civil Rights Division, Mr. Kenichi Shibayama's and Mr. Takeshi Shibayama's brother's, Mr. Isamu Shibayama's, appeal of the denial of compensation by the ORA was rejected. Mr. Isamu Shibayama's appeal was filed on August 17, 1993, but not acted on by the Attorney General until February 13, 1996, when David K. Flynn, Chief of the Appellate Section of the Civil Rights Division, DOJ, affirmed the ORA's determination of Mr. Isamu Shibayama's ineligibility on the same basis as Mr. Kenichi Shibayama's and Mr.

Takeshi Shibayama's ineligibility determinations.

This court finds that to require Mr. Kenichi Shibayama and Mr. Takeshi Shibayama to submit an administrative appeal pursuant to 28 C.F.R. § 74.15 et seq., is not required under the CLA. The record also demonstrates that such an appeal would be futile. The CLA has granted this court jurisdiction to review the denial of redress compensation under the CLA, "[o]nce an applicant [makes] a timely claim, ... he or she [becomes] entitled to the procedural rights the statute established, including the right to judicial review. Our review authority persists for all timely but rejected claimants ...." *Obadele v. United States*, 52 Fed.Cl. 432, 438 (2002). The defendant's motion to dismiss because the plaintiffs, Mr. Kenichi Shibayama and Mr. Takeshi Shibayama, allegedly have failed to exhaust administrative remedies is, therefore, denied.

### III. STATUTE OF LIMITATIONS

Alternatively, defendant asserts that Mr. Kenichi Shibayama's claim for CLA compensation is barred by the six-year statute of limitations. Defendant argues that the statute of limitations for this case began to run either when plaintiff, Mr. Kenichi Shibayama, received his initial determination of ineligibility by the ORA on November 10, 1992, or when he was barred by the sixty-day limitation for filing an administrative appeal on January 11, 1993.

Suits against the United States are subject to a six year statute of limitations under 28 U.S.C. § 2501 (2000). This statute sets an express limitation on the jurisdiction granted to this court under the Tucker Act. *Franconia Assocs. v. United States*, 240 F.3d 1358, 1362 (Fed.Cir.2001), *reh'g and reh'g en banc denied* (Jun 12, 2001); *Alder Terrace, Inc. v. United States*, 161 F.3d at 1376–77; *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1454 (Fed.Cir.1997); *Hart v. United States*, 910 F.2d 815, 817 (Fed.Cir.1990) (citing *Soriano v. United States*, 352 U.S. 270, 273–74, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957)). The six-year time bar on actions against the United States is "jurisdictional, because filing within the six-year period was a condition of the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491(a)(1)." *Caguas Cent. Federal Sav. Bank v. United States*, 215 F.3d 1304, 1310 (Fed.Cir.2000), *cert. denied*, 531 U.S. 1070, 121 S.Ct. 759, 148 L.Ed.2d 661 (2001); *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d at 1454; *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988). Because the statute of limitations affects this court's subject matter jurisdiction, the requirement is strictly construed, and may not be waived by the court. *Alder Terrace, Inc. v. United States*, 161 F.3d at 1376–77; *Martinez v. United States*, 48 Fed.Cl. 851, 857 (Fed.Cl. 2001); *Entines v. United States*, 39 Fed.Cl. 673, 678 (1997), *aff'd*, 185 F.3d 881 (Fed.Cir.) (table), *cert. denied*, 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999); *McDonald v. United States*, 37 Fed.Cl. 110, 113 (1997), *aff'd*, 135 F.3d 778 (Fed.Cir.1998) (table).

"A claim first accrues 'when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment ...'" *Lins v. United States*, 231 Ct.Cl. 579, 582, 688 F.2d 784, 786 (1982) (quoting *Nager Electric Co. v. United States*, 177 Ct.Cl. 234, 240, 368 F.2d 847, 851 (1966)), *cert. denied*, 459 U.S. 1147, 459 U.S. 1147, 74 L.Ed.2d 995 (1983); *Franconia Assocs. v. United States*, 240 F.3d at 1362; *Alder Terrace, Inc. v. United States*, 161 F.3d at 1377; *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577; *Oceanic Steamship Co. v. United States*, 165 Ct.Cl. 217, 225, 1964 WL 8621 (1964); *Bowen v. United States*, 49 Fed.Cl. at 675. In other words, "a cause of action against the Government first accrues when all of the events which fix the Government's alleged liability have occurred, and the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577; *Alder Terrace, Inc. v. United States*, 161 F.3d at 1377; *Cottrell v. United States*, 42 Fed.Cl. 144, 154 (1998); *Colon v. United States*, 35 Fed.Cl. 515, 517–18 (1996); *Anaheim Gardens v. United States*, 33 Fed.Cl. 773, 776 (1995).

"If disputes are subject to mandatory administrative proceedings, then the

claim does not accrue until their conclusion," or until all of plaintiff's administrative remedies have been exhausted. *Lins v. United States*, 231 Ct.Cl. at 582, 688 F.2d at 786. (citing *Friedman v. United States*, 159 Ct.Cl. 1, 11, 310 F.2d 381, 387 (1962), *cert. denied sub nom, Lipp v. United States*, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963)); *Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed.Cir.1995). However, pursuing permissive administrative remedies does not toll the statute of limitations. *Lins v. United States*, 231 Ct.Cl. at 582, 688 F.2d at 787; *see also Brighton Village Assocs. v. United States*, 52 F.3d at 1060. When "an administrative remedy is permissive (i.e., suit may be brought without exhausting the remedy), the court has usually held that the running of limitations is not deferred or tolled by such optional administrative considerations." *Friedman v. United States*, 159 Ct.Cl. at 11–12, 310 F.2d at 388.

■ On January 2, 1989, Mr. Kenichi Shibayama completed an ORA Voluntary Information Form providing current and historical information on his potential eligibility for redress under the CLA. By letter dated November 10, 1992, the ORA notified Mr. Kenichi Shibayama that subsequent to a thorough investigation, ORA determined that he was not a permanent resident alien during the internment period and was ineligible for redress payment under the CLA. The November 10, 1992 correspondence also stated that the ORA found that Mr. Kenichi Shibayama did not obtain permanent resident alien status extending retroactively to the internment period. At that point, as found above, Mr. Kenichi Shibayama was permitted to file suit in the Court of Federal Claims pursuant to the CLA.

The plaintiffs claim that Mr. Kenichi Shibayama and Mr. Takeshi Shibayama made several inquiries and were in contact with ORA about the status of their redress claim subsequent to receipt of his first letter of denial on April 22, 1992. According to the plaintiffs, therefore, "they were led to believe that the ORA *was still reviewing their claims*" (emphasis in original). Indeed, on October 26, 1994, the Office of the General Counsel for INS reviewed Mr. Kenichi Shi-

bayama's permanent resident alien status. In addition, on May 4, 1995, the ORA responded to an inquiry by Mr. Kenichi Shibayama regarding the status of his redress claims under the CLA.

Although the plaintiff, Mr. Kenichi Shibayama, may have been in contact with the ORA following the initial denial of his claim of eligibility on November 10, 1992, the statute of limitations began to run on his receipt of the denial. The appeals process provided by 28 C.F.R. § 74.15 et seq. was a permissive process, as found above, and as 50 U.S.C. app. § 1989b–4(h)(1) states, "[a] claimant may seek judicial review of a denial of compensation ... in the United States Court of Federal Claims ...." Because the further pursuit of administrative remedies with the ORA by Mr. Kenichi Shibayama was permissive, the running of the statute of limitations is not deferred or tolled. *See Camacho v. United States*, 204 Ct.Cl. 248, 260, 494 F.2d 1363, 1369 (1974); *Steel Improvement & Forge Co. v. United States*, 174 Ct.Cl. 24, 29, 355 F.2d 627, 631 (1966); *Friedman v. United States*, 159 Ct.Cl. at 11–12, 310 F.2d at 388; *Toney v. United States*, 43 Fed.Cl. 389 (1999); *P.B. Dirtmovers, Inc. v. United States*, 30 Fed.Cl. 474, 477 (1994) (citing *Soriano v. United States*, 352 U.S. 270, 274–75, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957)). Mr. Kenichi Shibayama's claim accrued when he received the denial of compensation under the CLA on November 10, 1992, but he did not file his complaint in federal district court until February 18, 1999. Consequently, his claims regarding the review of his denial of redress compensation by ORA under the CLA are dismissed.

## IV. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

■ The defendant has filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526

U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Consolidated Edison Co. v. O'Leary,* 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined,* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.' "); *RCS Enterps., Inc. v. United States,* 46 Fed.Cl. 509, 513 (2000).

Pursuant to RCFC 8(a)(1) and Federal Rules of Civil Procedure Rule 8(a)(1), a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974);

*Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir.1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir.1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001); *Coast Fed. Bank v. United States,* 48 Fed.Cl. 402, 443 (2000); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges plaintiffs' claim for relief, however, the plaintiffs cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. "A motion to dismiss under Rule 12(b)(4) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy." *Perez v. United States,* 156 F.3d at 1370.

Pursuant to 50 U.S.C. § 1989b–4(h)(1), this court has jurisdiction to decide plaintiffs' claim for redress under the CLA. In their compliant, plaintiffs assert that the federal government has unlawfully withheld plaintiffs' benefits under the CLA, and that "[p]laintiffs will continue to suffer violation of their federal civil rights unless defendants are enjoined to provide them full restitution of all of the benefits to which they are entitled under the CLA". The defendant asserts in its motion to dismiss for failure to state a claim that "[p]laintiffs can state no set of facts that would entitle them to relief under the CLA because they were not United States citizens or permanent resident aliens during the internment period."

The plaintiffs' complaint states that the CLA established a restitution program "for each eligible victim of the United States detention/relocation scheme." The complaint

also states that "[e]ligibility for this restitution program is restricted to persons who were U.S. citizens or permanent resident aliens at the time of their internment and relocation." The plaintiffs do not deny that they were not United States citizens at the time of internment. The plaintiffs state that "[t]he Latin Americans of Japanese ancestry were clearly not U.S. citizens." The plaintiffs allege, however, that they were three individuals who were forcibly abducted by the United States during World War II and held in military facilities in the United States. The complaint further alleges that the defendant characterized the plaintiffs as "illegal aliens" rather than "lawful resident aliens" and, therefore, challenge that characterization as applied to them. The plaintiffs allege they have been denied compensation under the CLA "[b]ecause of [the] United States-imposed obligation to leave the United States, they were denied the retroactive status that many other Latin Americans, including members of their own family, received," and now challenge that denial.

The CLA provides that "the Attorney General ... shall pay out of the Fund to each eligible individual the sum of $20,000...." 50 U.S.C. app. § 1989b–4(a)(1). The Act defines an eligible individual as an individual of Japanese ancestry who was a permanent resident alien and confined, held in custody, relocated, or otherwise deprived of liberty or property as a result of the United States government's internment of people of Japanese ancestry during World War II. See id. § 1989b–7. Taking the plaintiffs' allegations in their complaint as true, if the defendant mischaracterized them as illegal aliens and not permanent resident aliens, and the denial of CLA compensation was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the plaintiffs have stated a claim for relief. 50 U.S.C. § 1989b–4(h)(1). The defendants motion to dismiss for failure to state a claim is denied.

## V. MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD

Defendant has filed a motion for summary judgment on the administrative record pursuant to RCFC 56.1. The defendant alleges that based on the plaintiffs' Administrative Records, the court should find that the ORA properly determined that Mr. Kenichi Shibayama, Mr. Takeshi Shibayama and Mr. Isamu Shibayama were ineligible for compensation under CLA.

RCFC 56.1(a) dictates that such motions are reviewed under the same standards as are motions for summary judgment under RCFC 56(a). See Rust Constructors Inc. v. United States, 49 Fed.Cl. 490, 493 (2001); World Travel Serv. v. United States, 49 Fed. Cl. 431, 438 (2001); Nickerson v. United States, 35 Fed.Cl. 581, 588 (1996), aff'd, 113 F.3d 1255 (Fed.Cir.1997) (table). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed.Cir.), reh'g denied and reh'g en banc denied (2001); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed.Cir.2001); Avenal v. United States, 100 F.3d 933, 936 (Fed.Cir. 1996), reh'g denied (1997); Creppel v. United States, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–48, 106 S.Ct. 2505; see also Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Curtis v. United States, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), cert. denied, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), reh'g denied, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 52 Fed.Appx. 507 (Fed.Cir.2002); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir. 1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.*, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States*, 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine*

*Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States*, 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

In support of its motion for judgment on the administrative record, the defendant contends that the language of the Act is not ambiguous, granting eligibility only to those who were citizens of the United States or permanent resident aliens during the internment period. Plaintiffs state that "[n]othing could be clearer that the term 'permanent resident alien,' defined by the Act itself as 'an alien lawfully admitted to the United States for permanent residence.' 50 U.S.C. app § 1989b–7(3)."

■ The CLA sets forth the requirements applicable to this case for compensation to an eligible individual as follows: (1) the individual must be of Japanese ancestry and living on the date of the enactment of the CLA, August 10, 1988; (2) the individual must have been evacuated, relocated, or interned during the period beginning on December 7, 1941, and ending on June 30, 1946; (3) and the person must have been a permanent resident alien during the internment period. 50 U.S.C. app § 1989b–7. As the plaintiffs state, the term "permanent resident alien," as defined by the Act, is an "an alien lawfully admitted into the United States for permanent residence." 50 U.S.C. app § 1989b–7(3).

The parties have stipulated that the plaintiffs, Takeshi Shibayama, Isamu Shibayama, and Kenichi Shibayama are brothers of Japanese ancestry who were born in Peru. The parties have also stipulated that the plaintiffs were taken to the Crystal City Internment Camp, Crystal City, Texas on December 31, 1944. The plaintiffs state that on September 9, 1946, Mr. Takeshi Shibayama, Mr. Isamu Shibayama, and Mr. Kenichi Shibayama were released from the Crystal City Internment Camp and subsequently relocated to Seabrook Farms, New Jersey.

The plaintiffs claim that Takeshi Shibayama, Isamu Shibayama, and Kenichi Shibaya-

ma have met all the statutory requirements for redress under the CLA, including their status as permanent resident aliens. Plaintiffs allege that they held permanent resident alien status at the time of internment "both directly and under color of law." The brothers assert that:

> Plaintiffs were clearly not illegal aliens at any time during their internment. At no time did Plaintiffs ever violate a single provision of United States immigration laws that the United States did not itself excuse. Their presence in the United States was entirely at the whim of the United States itself—the United States went and got them and the United States maintained the here. They cannot be legal and illegal at the same time. At no time during the time Plaintiffs were under the control of the United States did they ever have a fixed departure date. Accordingly, they were residing continuously and legally here for the purpose of the definition of permanent resident under 8 U.S.C. § 1101(a)(31) .... [7]

Takeshi Shibayama's, Kenichi Shibayama's, and Isamu Shibayama's Administrative Records, however, demonstrate, and plaintiffs do not dispute, that they became permanent resident aliens in 1956. By letter dated November 10, 1992, the ORA notified Mr. Kenichi Shibayama that he was not a permanent resident alien during the internment period and was ineligible for redress payment under the CLA. On April 22, 1993, the ORA determined that Mr. Takeshi Shibayama was ineligible for CLA compensation and on June 28, 1993, Mr. Isamu Shibayama received a letter from the ORA which determined that he also was ineligible for compensation under the CLA. The ORA found that Kenichi Shibayama, Mr. Takeshi Shibayama, and Mr. Isamu Shibayama were not permanent resident aliens during the internment period and they did not later obtain that status retroactively.

Moreover, the INS reviewed the plaintiffs' immigration status to determine whether their status had been mischaracterized and whether plaintiffs had received retroactive resident status in 1956 dating back to their initial date of entry in 1944. On October 26, 1994, the Office of the General Counsel for INS reviewed Mr. Takeshi Shibayama's and Mr. Kenichi Shibayama's permanent resident alien status. The Office of the General Counsel determined in its review that Mr. Takeshi Shibayama and Mr. Kenichi Shibayama obtained permanent residence by entry into the United States with an immigrant visa rather than by suspension of deportation. Their permanent resident status dated from their entry in 1956 rather than their entry in 1944. The office of the General Counsel for INS determined that Mr. Kenichi Shibayama's and Mr. Takeshi Shibayama's acquisition of permanent residence did not date back to the period fixed by the Civil Liberties Act.

On May 11, 1995, the Office of the General Counsel for INS also conducted a review of Mr. Isamu Shibayama's resident alien status. Similarly, the Office of the General Counsel for INS determined that Mr. Isamu Shibayama also obtained permanent resident alien status by entry into the United States through the port of entry in Detroit, Michigan. The Office of the General Counsel for INS concluded, therefore, that Mr. Isamu Shibayama obtained permanent residence by entry into the United States with an immigrant visa rather than by suspension of deportation. His permanent resident status dated from his entry in 1956 rather than his entry in 1944. The Office of the General Counsel for INS determined that Mr. Isamu Shibayama's acquisition of permanent residence did not date back to the period fixed by the Civil Liberties Act.

The plaintiffs, Mr. Kenichi Shibayama, Mr. Takeshi Shibayama, and Mr. Isamu Shibayama, were given discretionary relief under section 244(e) of the Immigration and Na-

---

**7.** The plaintiffs cite 8 U.S.C. § 1101(a)(31), which defines the word "permanent." The correct citation to "lawfully admitted for permanent residence" is 8 U.S.C. § 1101(a)(20), which states the following: "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

tionality Act of 1952 when they obtained permanent residence status in 1956. Under the Immigration and Nationality Act, Congress gave the Attorney General the authority to "permit any alien under deportation proceedings, ..., to depart voluntarily from the United States at his own expense in lieu of deportation ...." Pub.L. No. 82–414, ch. 5, § 244(e), 66 Stat. 217. The plaintiffs proceeded to the United States Consulate in Windsor, Ontario and obtained immigrant visas and reentered the United States through the port of Detroit, Michigan. The plaintiffs then obtained permanent resident status. Under the Immigration and Nationality Act of 1952, "[u]pon application by an alien who is found by the Attorney General to meet the requirements of ... subsection (a) of this section ..., the Attorney General shall record the alien's lawful admission for permanent residence as of the date the cancellation of deportation" order approving the application for the adjustment of status made by the Attorney General. Pub.L. No. 82–414, ch. 5, § 245(b), (d) 66 Stat. 217. The ORA found that Mr. Kenichi Shibayama's, Mr. Takeshi Shibayama's, and Mr. Isamu Shibayama's status as lawfully admitted permanent residents dated from 1956. Their Administrative Records are clear, and the plaintiffs do not disagree that they became permanent legal residents in 1956. By the terms of the statute, their status as permanent legal residents did not apply retroactively to their initial entry into the United States in 1944. *See* Pub.L. No. 82–414, ch. 5, § 245(b), 66 Stat. 217.

Plaintiffs, however, also contend they were granted permanent resident alien status during the internment period because they were permanent resident aliens under color of law (PRUCOL). Under the doctrine of PRUCOL, permanent resident alien status can be implied if an alien is "residing in the United States with the INS's knowledge and permission and whom the INS does not contemplate deporting." *Lewis v. Thompson*, 252 F.3d 567, 572 (2nd Cir.2001). However, PRUCOL status is not the equivalent of being lawfully admitted for permanent residence. *Smart v. Shalala*, 9 F.3d 921, 923 (11th Cir.1993). The United States Court of Appeals for the Eleventh Circuit stated:

"Lawfully admitted for permanent residence" is defined by statute. The Immigration and Naturalization Act provides that the term "lawfully admitted for permanent residence" means the *status* "of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws."

*Id.* (emphasis in original) (citations omitted). It is true that "an alien with PRUCOL status enjoys certain statutory benefits. PRUCOL is a criterion for determining whether an alien is eligible for benefits under certain public welfare programs, such as Medicaid and Supplemental Security Income for the Aged, Blind and Disabled." *Id.* (citing 42 U.S.C. § 1382c(a)(1)(B)(i), 20 C.F.R. § 416.1618, 42 C.F.R. § 435.408(a)). A statute, however, must explicitly define PRUCOL status in the statute's eligibility requirements for PRUCOL to be applicable. *See id.*

Plaintiffs cite to *Holley v. Lavine*, 553 F.2d 845 (2nd Cir.1977) and *Berger v. Heckler*, 771 F.2d 1556 (2nd Cir.1985), arguing that because plaintiffs enjoy PRUCOL status, they should be included within the CLA eligibility requirements. *Holley* and *Berger* were cases that addressed social benefits programs. *Holley v. Lavine*, 553 F.2d at 847; *Berger v. Heckler*, 771 F.2d at 1559. In both cases, benefits were conferred upon an individual if that individual was a citizen or an alien lawfully admitted for permanent residence or otherwise a permanent resident in the United States under color of law. *Holley v. Lavine*, 553 F.2d at 847; *Berger v. Heckler*, 771 F.2d at 1559. Because the statutes at issue specifically provided benefits for PRUCOL status individuals, plaintiffs in *Holley* and *Berger* were able to obtain the public benefits. *Holley v. Lavine*, 553 F.2d at 851; *Berger v. Heckler*, 771 F.2d at 1559–60. In the case at bar, however, the CLA does not include individuals who have obtained PRUCOL status. The CLA specifically limits redress to those who were United States citizens or permanent resident aliens during the internment period. Thus, implied permanent resident alien status-such as plaintiffs argue they have under the doctrine of

PRUCOL-does not satisfy eligibility requirements under the CLA. Indeed, in making its determinations regarding Mr. Isamu Shibayama's CLA eligibility, the defendant informed plaintiffs that "the [CLA] does not provide relief to non-permanent resident aliens who were residing in the United States under color of law."

Based on their Administrative Records, none of the plaintiffs were United States citizens or permanent resident aliens during the internment period. The manner in which plaintiffs received their permanent resident alien status in 1956 did not make them eligible to have their status applied retroactively. The court, therefore, finds that the ORA's denial of compensation to the plaintiffs, Mr. Takeshi Shibayama, Mr. Kenichi Shibayama, and Mr. Isamu Shibayama, was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## VI. PLAINTIFFS' REMAINING CLAIMS

The plaintiffs' complaint describing their causes of action appears to seek redress payments under the CLA. The complaint, however, also states that the plaintiffs seek relief related to their internment during World War II based on the violation of the Fifth Amendment, 42 U.S.C. § 1981, the APA, and international humanitarian law having the status of *jus cogens*. In addition, plaintiffs seek a disbursement of funds from the United States for public education concerning the alleged unlawful abduction and detention of Latin Americans of Japanese ancestry by the United States and restitution for excessive income taxes assessed based on the alleged characterization of the plaintiffs as "illegal aliens."

The Court of Appeals for the Federal Circuit has stated that "[w]hen determining jurisdiction, [ ], we must look to the true nature of the underlying action." *Terran v. Sec'y of Health & Human Servs.*, 195 F.3d 1302, 1310 (Fed.Cir.1999), *reh'g denied* (2000). The CLA has vested the Court of Federal Claims with jurisdiction to review whether the ORA's determination of the denial of compensation was "not in accordance with law." 50 U.S.C. app. § 1989b–4(h)(1). In fact, almost all the claims raised by the plaintiffs are claims for monetary relief based on the redress payment provisions in the CLA, relief is circumscribed by the CLA and capped at $20,000.00 per plaintiff.

The United States Court of Appeals for the Federal Circuit addressed similar claims in *Kanemoto v. Reno*, 41 F.3d 641 (Fed.Cir. 1994). As in the present case, the plaintiff in *Kanemoto* sued the ORA after being denied redress under the CLA. *Id.* at 643. Kanemoto's complaint also alleged four causes of action, including violations of the APA, and the Equal Protection and Due Process clauses of the United States Constitution. *Id.* Additionally, "[a]ll four causes of action alleged that ORA wrongfully denied payment of the restitution" provided by the CLA. *Id.* For her alleged injuries, the plaintiff in *Kanemoto* requested the court to enjoin the government from interpreting the CLA as excluding certain individuals and compel the Attorney General to grant her compensation under the CLA and payment of the redress amount. *Id.* The United States District Court for the Northern District of California denied the government's motions to dismiss or transfer the case to the United States Court of Federal Claims and the government appealed. *Id.* Upon appeal, the United States Court of Appeals for the Federal Circuit reversed the district court's decision, holding that the plaintiff's claims could be completely redressed under the CLA and because the Tucker Act granted the United States Court of Federal Claims jurisdiction over CLA claims, the district court should have granted the government's motion to transfer. *Id.* at 646. In so holding, the Court of Appeals for the Federal Circuit held that "a 'naked money judgment' would provide Kanemoto an adequate remedy." *Id.* at 645. The court stated further:

> Kanemoto cannot escape this conclusion merely by framing her claim for relief in declaratory or injunctive terms, as she appears to have done. "A party may not avoid the [Court of Federal Claims'] jurisdiction by framing an action against the federal government that appears to seek only equitable relief when the party's real effort is to obtain damages...."

*Id.* at 646 (quoting *Marshall Leasing, Inc. v. United States,* 893 F.2d 1096, 1099 (9th Cir. 1990)).

The plaintiffs in this case originally asserted equitable and legal relief. Both causes of action in plaintiffs' complaint, however, assert, "Plaintiffs will continue to suffer violation of their rights as beneficiaries of the CLA unless defendants are enjoined to provide to full restitution of all of the benefits to which they were entitled under the CLA, and which defendants have unlawfully withheld." Moreover, plaintiffs assert that "only the relief requested will redress [their] injuries." Despite plaintiffs' equitable claims, they requested eligibility and redress under the CLA. As in *Kanemoto,* all the plaintiffs' "claims are predicated on the government's denial of the statutory amount of restitution and at bottom seek only the payment of the $20,000. Jurisdiction for such claims properly lies in the Court of Federal Claims." *Id.*

### A. Administrative Procedure Act

■ The plaintiffs' complaint states that their challenge to the ORA's denial of CLA compensation is a claim under the APA.[8] In a case also asking for damages under the CLA, the Court of Appeals for the Federal Circuit in *Kanemoto v. Reno,* recognized, however, that the claim brought by the plaintiffs in *Kanemoto* was really an attempt to disguise a CLA claim as an APA claim. *Id.* at 644. Moreover, the court wrote that "[s]ection 704 of the APA provides that '[a]gency action made reviewable by statute and final agency action *for which there is no other adequate remedy* in a court are subject to judicial

review.'" *Id.* at 644 (quoting 5 U.S.C. § 704) (emphasis in original). The court continued, "[t]he converse is that where agency action is otherwise reviewable in court and an adequate remedy is available in connection with that review, the APA's waiver of sovereign immunity under [the APA] is not available." *Id.* The plaintiffs in this case seek the review of the ORA's denial of compensation under the CLA. This court has been granted exclusive jurisdiction to review the denial of compensation under the CLA. 50 U.S.C. app. § 1989b–4(h). The Court of Appeals for the Federal Circuit held in *Kanemoto* that under these circumstances, "the Tucker Act provides [the plaintiffs] with an 'adequate remedy' within the meaning of section 704 of the APA. Therefore, jurisdiction for this action is not available under the APA ...." *Kanemoto v. Reno,* 41 F.3d at 646. Consequently, the court will not address the plaintiffs' claims under the APA and the defendant's motion for summary judgment on the administrative record regarding the plaintiffs' APA claims is granted.

### B. Fifth Amendment

■ The plaintiff also requests the court to grant declaratory relief and hold that defendant's actions against plaintiffs in denying them compensation under the CLA was "in violation of the right to protection against discrimination on the basis of race, citizenship, or alienage, and to protection against prolonged arbitrary detention," under the Fifth Amendment. Plaintiffs' also allege that the denial of compensation under the CLA was "based on an improper characterization of their status as 'illegal aliens.' This mis-

---

8. Because the plaintiffs' claims in this case request compensation under the CLA, and this court has exclusive jurisdiction to adjudicate denials of redress payments, the court follows the holding in *Kanemoto v. Reno,* and addresses the plaintiffs' APA claims as claims under the CLA. *See Kanemoto v. Reno,* 41 F.3d at 646. The court notes, however, that generally, the APA was not conceived of in jurisdictional terms. *Califano v. Sanders,* 430 U.S. 99, 106, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). "We thus conclude that the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action." *Id.* at 107, 97 S.Ct. 980. "The Administrative Procedure Act does not establish jurisdiction in this court [Court of Federal Claims] over claims for money." *Union Bank*

*and Trust Co. v. United States,* 27 Fed.Cl. 403, 404 (1992), *aff'd,* 6 F.3d 788 (Fed.Cir.1993) (citing *Berry v. United States,* 27 Fed. Cl. 96, 102–03 (1992)); *see also Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997) ("Once again, the trial court [Court of Federal Claims] correctly held that it lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1994)."); *Loeh v. United States,* 53 Fed.Cl. 2, 4 (2002) ("As an initial matter, the APA neither confers jurisdiction on the Court of Federal Claims nor mandates the payment of money and, thus, does not provide a basis for suit.").

characterization and denial of redress under the CLA constitutes a ... violation of the Fifth amendment." [9] The defendant, however, again has moved for summary judgment on the administrative record on the plaintiffs' Fifth Amendment challenges to the CLA and the defendant's application of its provisions.

The United States Court of Federal Claims recently addressed a similar constitutional challenge to the denial of compensation under the CLA to African–Americans in *Obadele v. United States*. In the *Obadele* opinion, the court addressed the plaintiffs' claims that "the ORA's denial of their claims on the grounds that they were not of *Japanese* descent ... violates the equal protection clause and the due process clause of the Fourteenth and Fifth Amendments, respectively." *Obadele v. United States*, 52 Fed.Cl. at 440 (emphasis in original). Although the *Obadele* court did not address the exclusion of Latin Americans of Japanese ancestry, the court did address the ORA's determination of ineligibility to a group of individuals excluded from the coverage of the CLA, as were the plaintiffs in this case. The *Obadele* court held the following:

> Federal district courts and presumably this Court as well, faced with a statute that does not withstand an equal protection challenge, may either declare the statute a nullity or may eliminate the offending classification to permit the Plaintiff to qualify. *See Jacobs v. Barr*, 959 F.2d 313, 317 (D.C.Cir.[1992]) (citing *Heckler v. Mathews*, 465 U.S. 728, 738–39, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) and *Califano v. Westcott*, 443 U.S. 76, 89–91, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979)). Plaintiffs seek the latter remedy. In this forum, the Plaintiffs must make a legal case, which is far different from the political case they would make to Congress. We turn now to the Plaintiffs' legal case, and we are compelled

to say they have not persuaded us. Consequently, we need not concern ourselves with the proper remedy.

In *Adarand [Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)], the Supreme Court addressed "benign" or "remedial" racial classifications in the context of federal contracting programs benefitting small business concerns owned by socially and economically disadvantaged individuals. 515 U.S. at 205–212, 115 S.Ct. 2097 [1995]. Eligibility under the programs was in part based upon racial presumptions. Tracing the history of its review of remedial race-based governmental actions, the Court reached a consensus on the appropriate level of constitutional analysis and confirmed that all race-based classifications, by any level of government, must survive strict scrutiny. *Id.* at 227, 115 S.Ct. 2097.

The CLA is an example of a "remedial" race-conscious measure—it provides for the administration of a Fund to compensate those of *Japanese ancestry* for injustices resulting from the evacuation, relocation and internment of civilians in the United States during World War II. Therefore, the race-based eligibility guidelines of the ORA "are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* In applying this standard, the Court must find a factual basis for the conduct being compensated. *See id.* at 229, 115 S.Ct. 2097 ('Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute.') (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 545, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)). Other factors implicated by strict scrutiny include whether the government

---

9. As stated above, because the plaintiffs' claims in this case request compensation under the CLA, and this court has exclusive jurisdiction to adjudicate denials of redress payments, the court follows the holding in *Kanemoto v. Reno*, and addresses the plaintiffs' Fifth Amendment claims as claims under the CLA. *See Kanemoto v. Reno*, 41 F.3d at 646. The court notes, however, that in general, the language of the Equal Protection Clause and the Due Process Clause do not man-

date payment of money and, thus, also do not invoke jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See James v. Caldera*, 159 F.3d 573, 581 (Fed.Cir.1998); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed.Cir.1995); *Mullenberg v. United States*, 857 F.2d 770, 773 (Fed. Cir.1988); *Alkalay v. United States*, 54 Fed.Cl. 93, 100 (2002); *Richards v. United States*, 20 Cl.Ct. 753, 757–58 (1990).

considered the use of race-neutral means that serve the same interest. *Id.* at 237–38, 115 S.Ct. 2097 (citing *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 507, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)), and whether the program was appropriately limited so that "it will not last longer than the discriminatory effects it is designed to eliminate." *See id.* (citation omitted).

As the ORA observed in acting on Dr. Obadele's claim, the CLA has already survived constitutional attack. In *Jacobs v. Barr,* 959 F.2d 313 (D.C.Cir.), *cert. denied,* 506 U.S. 831, 113 S.Ct. 95, 121 L.Ed.2d 56 (1992), an American of German ancestry challenged the redress program on equal protection grounds. The Plaintiff had been interned during WWII but was denied a redress payment because he was not of Japanese ancestry.

The Court of Appeals for the D.C. Circuit upheld the Act. Although the case predated *Adarand's* mandate to extend strict scrutiny to remedial racial classifications, the Court concluded that the CLA survives even this highest level of analysis. *Id.* at 318. It then went on to apply the heightened scrutiny "for demonstrative purposes" and held:

> Congress's finding that Japanese–Americans were the victims of prejudice ... is amply supported by historical evidence that the internment policy extended to Japanese–American but not to German–American children. Congress, therefore, had clear and sufficient reason to compensate interns of Japanese but not German descent; and the compensation is ... *narrowly tailored* to Congress's *compelling interest* in redressing a shameful example of national discrimination.

*Id.* at 321–22 (emphasis added). As the Court noted, the Act was aimed at specific governmental actions as opposed to discrimination in general. Persons of Japanese descent who suffered hardship because of governmental action were denied redress payments if their injuries were "not related to any evacuation, internment or relocation program, as required for redress under the Civil Liberties Act." *Kane-*

*ko v. United States,* 122 F.3d 1048, 1053 (Fed.Cir.1997). Plaintiffs fail to explain why we should not be persuaded by the D.C. Circuit's finding of a compelling governmental interest. Nor do they propose that there is any way to compensate the victims of the wartime emergency actions through a less discriminatory alternative. *Wygant* [*v. Jackson Board of Education*], 476 U.S. [267] at 280 n. 6, 106 S.Ct. 1842[, 90 L.Ed.2d 260 (1986)]. And unlike Mr. Jacobs, they do not challenge the amply supported facts showing the racial motivation and impact of the internment policy. *See* 50 U.S.C. app. § 1989a. Instead, they condemn "racial politics" and allege simply: "The Act was not attempting to further a compelling governmental [interest] but was a concession to public and political pressure." Although uttered as epithets, the Plaintiffs are really only saying that the victims and heirs of one historical wrong have succeeded in persuading the public and Congress of their entitlement to redress, whereas Dr. Obadele and likeminded advocates are in the process of trying to achieve that same result for another historical wrong. The D.C. Circuit's analysis and conclusions satisfy the later-articulated tests of the Supreme Court in *Adarand,* and we are persuaded that the Court came to the correct result. We therefore reject Plaintiffs' claim that the ORA denial of their applications was contrary to law because it relied on a constitutionally-defective racial classification. The decision of the ORA is affirmed.

*Id.* at 442–44.

The plaintiffs in the above captioned case have claimed Fifth Amendment violations by the ORA. The plaintiffs, however, have not explained why the court should not find a compelling government interest in Congress' determination to compensate only United States citizens and permanent resident aliens under the CLA. Indeed, the plaintiffs state, "the Court of Federal Claims generally declines to exercise jurisdiction over equal protections claims," but the plaintiffs have not further addressed these claims before the court. Based on the careful analysis provided by the court in *Obadele v. United States,* the court finds that the ORA's exclusion of

the plaintiffs from compensation under the CLA is not only not in violation of the Fifth Amendment, but also should be rejected as a claim under the CLA. Defendant's motion for summary judgment on the administrative record regarding the plaintiffs' Fifth Amendment claims is granted.

### C. 42 U.S.C. § 1981

The plaintiffs' complaint also references 42 U.S.C. § 1981 as a basis for bringing their claims before this court. The plaintiffs alleges that the denial of compensation under the CLA and the improper characterization of the plaintiffs as "illegal aliens" was in violation of the Civil Rights Act, 42 U.S.C. § 1981. The defendant has moved for summary judgment on the administrative record because ORA's denial of redress compensation under the CLA was not contrary to the Civil Rights Act, 42 U.S.C. § 1981.[10]

Section 1981(c) provides that "[t]he rights protected by this section are protected against the impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). Based on the plain language of the section 1981(c), the terms of the statute does not apply to the federal government. *See Davis v. United States Dept. of Justice,* 204 F.3d 723, 725 (7th Cir.2000) ("Thus, by its language, § 1981 does not apply to actions taken under color of federal law."); *Davis–Warren Auctioneers, J.V. v. FDIC,* 215 F.3d 1159, 1161 (10th Cir.2000); *Lee v. Hughes,* 145 F.3d 1272, 1277 (11th Cir.1998) ("Section 1981 provides a cause of action for individuals subjected to discrimination by private actors and discrimination under color of state law, but does not provide a cause of action for discrimination under color of federal law.") (citing *Espinueva v. Garrett,* 895 F.2d 1164, 1165 (7th Cir.), *cert. denied* 497 U.S. 1005, 110 S.Ct. 3241,

111 L.Ed.2d 751 (1990); *Williams v. Glickman,* 936 F.Supp. 1, 4 (D.D.C.1996); *Carlton v. Ryan,* 916 F.Supp. 832, 838 (N.D.Ill.1996); *La Compania Ocho, Inc. v. U.S. Forest Serv.,* 874 F.Supp. 1242, 1250–51 (D.N.M.1995)); *Omeli v. Nat'l Council of Senior Citizens,* 12 Fed.Appx. 304, 307 (6th Cir.2001) (unpublished table decision); *Kimboko v. United States,* 26 Fed.Appx. 817, 819 (10th Cir.2001) (unpublished table decision). The defendant's motion for summary judgment on the administrative record for the plaintiffs' 42 U.S.C. § 1981 claims is granted.

### D. International Humanitarian Law

The plaintiffs' complaint further requests the court to hold that "defendants' actions against plaintiffs were in violation of customary humanitarian law having the status of *jus cogens,* [and] were in violation of plaintiffs' rights under humanitarian law having the status of *jus cogens* to compensation for acts in violation of humanitarian law [sic]." The plaintiffs state that "certain equitable and other monetary and non-monetary relief based on *jus cogens* claims as falling under this Court's subordinate authority" is available in this court. According to plaintiffs' attorney, *jus cogens* norms invalidating any legislative act or executive order "would be an issue of first impression in this Court." The defendant filed a motion for summary judgment on the administrative record and asserted that the plaintiffs have not shown how the denial of compensation "under the CLA to individuals who were not United States citizens or permanent resident aliens during the internment period itself violated a peremptory rule of international law. This Plaintiffs cannot do. Accordingly, Plaintiffs' international law challenge to the CLA must

---

10. Again, as stated above, because the plaintiffs' claims in this case request compensation under the CLA, and this court has exclusive jurisdiction to adjudicate denials of redress payments, the court follows the holding in *Kanemoto v. Reno,* and addresses the plaintiffs' section 1981 claims as claims under the CLA. *See Kanemoto v. Reno,* 41 F.3d at 646. The court notes, however, that in general, it is well settled that this court does not have jurisdiction over civil rights claims brought under Title VII of the Civil Rights Act of

1964 or 42 U.S.C. §§ 1981 or 1983. *See Cottrell v. United States,* 42 Fed.Cl. 144, 149 (1998); *Blassingame v. United States,* 33 Fed.Cl. 504, 505, *aff'd,* 73 F.3d 379 (Fed.Cir.1995) (table) (rehearing denied), *cert. denied,* 517 U.S. 1237, 116 S.Ct. 1885, 135 L.Ed.2d 179 (1996); *Bunch v. United States,* 33 Fed.Cl. 337, 341 (1995), *aff'd,* 78 F.3d 605 (Fed.Cir.1996) (table); *Lee v. United States,* 33 Fed.Cl. 374, 378–79 (1995). Such jurisdiction has been granted to the United States District Courts.

**750**

fail." [11]

At oral argument held in this case, plaintiffs abandoned the claim relating to a violation of international humanitarian law taking the form of *jus cogens.* Plaintiffs' counsel stated the following:

> MS. PARKER: Your Honor, we feel that Defendant has misconstrued our use of jus cogens. We have never argued, and we pointed [sic] said, that we are not claiming that the CLA violates jus cogens. . . .
>
> *       *       *       *       *       *
>
> MS. PARKER: But what we do say is the existence of jus cogens norms that have bearing on the acts in question to which the Act redresses must be kept in mind at all times and we must presume that Congress would understand the jus cogens implications of the totality of the acts and that the Act should be construed in light of the prevailing jus cogens norms at that time.
>
> THE COURT: Well, I mean we're interpreting and discussing a restitution act. We're not really discussing at this time the morality of what was done to this group of people or the absence of morality of what was done to these people. We're discussing whether the Restitution Act applies to this particular group of Plaintiffs and, if so, why and if not, why not? But really not challenging the existence of the Act or what it stipulates.
>
> MS. PARKER: No.
>
> THE COURT: Nor does there appear to be a challenge to the definitional terms of the Act, more really— really what you've asked for is to include your Plaintiffs within the definition that's in the statute, not challenging the propriety of the statutory definition.
>
> MS. PARKER: Exactly.
>
> THE COURT: And so I don't see where there's an international law question really.
>
> MS. PARKER: We haven't raised a direct one other than because the acts for which Congress seeks redress are jus cogens violations and because jus cogens violations carry with them an obligation for redress one could easily construe the statute. Because one can easily construe the statute to apply to these particular Plaintiffs it gives an additional basis for granting them. We also wanted to—
>
> *       *       *       *       *       *
>
> MS. PARKER: It's informative, Your Honor. It's informative at the definitional—
>
> THE COURT: Well, it's not a basis for granting anything I don't think in this particular case.
>
> MS. PARKER: No. We're not asking— we're not indicating— we're not presenting it as a cause of action, Your Honor, nor have we ever.

The court, therefore, dismisses the plaintiffs' claim based on an alleged violation of customary humanitarian law bearing the status of *jus cogens.*

### E. Disbursement of Funds for Public Education and Restitution for Excessive Income Taxes

Finally, the plaintiffs state in their complaint that they request this court to declare that at no time were plaintiffs "illegal aliens," grant "unspecified" restitution for excessive income taxes, and sponsor research and public education regarding the relocation and internment of similar situated individuals. The plaintiffs have not identified a basis for the relief it seeks in these regards. The defendant has filed a motion to dismiss for lack of subject matter jurisdiction for these claims. As the Supreme Court held in *United States v. Mitchell:*

> It nonetheless remains true that the Tucker Act " 'does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. at 538[, 100 S.Ct. 1349], quoting *United States v. Testan,* 424 U.S. at 398[, 96 S.Ct. 948]. A substantive right must be found in some other source of law, such as 'the Constitution, or any Act of

---

**11.** *See also Comm. of United States Citizens Living in Nicar. v. Reagan,* 859 F.2d 929, 940 (D.C.Cir.1988) ("Appellants cite no authority for this assertion that a peremptory norm of international law operates domestically as if it were a part of our Constitution. So far as we know, no federal court has ever considered the concept— much less the domestic effect—of *jus cogens.*").

Congress, or any regulation of an executive department.' 28 U.S.C. § 1491. Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States, *see United States v. King,* 395 U.S. 1, 2–3[, 89 S.Ct. 1501, 23 L.Ed.2d 52] (1969), and the claimant must demonstrate that the source of substantive law he relies upon " 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.' " *United States v. Testan,* 424 U.S. at 400[, 96 S.Ct. 948], quoting *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

*United States v. Mitchell,* 463 U.S. at 216–17, 103 S.Ct. 2961. Because the plaintiffs have not identified a jurisdictional basis for the court to provide the relief that plaintiffs request, the court finds that it does not have jurisdiction to consider the plaintiffs' remaining claims. The defendant's motion to dismiss the remaining claims is granted.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss for lack of subject matter jurisdiction is **DENIED**, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is **DENIED**, defendant's motion to dismiss Mr. Kenichi Shibayama as barred by the applicable statute of limitations is **GRANTED**, and defendant's motion for summary judgment on the administrative record as to the review of the ORA's denial of the claims of Mr. Isamu Shibayama and Mr. Takeshi Shibayama and, alternatively, Mr. Kenichi Shibayama, is **GRANTED**. The defendant's motion for summary judgment on the administrative record of the plaintiffs' claims for violation of the Fifth Amendment, 42 U.S.C. § 1981 and the APA, is **GRANTED**. The defendant's motion to dismiss the plaintiffs' claims for violation of international humanitarian law, disbursement of funds from the United States for public education concerning the alleged unlawful abduction and detention of Latin Americans of Japanese ancestry by the United States and restitution for excessive income taxes assessed, based on the alleged

characterization of the plaintiffs as "illegal aliens," is **GRANTED**.

**IT IS SO ORDERED.**